# Milberg Weiss Bershad Hynes & Lerach LLP

One Pennsylvania Plaza, New York, NY 10119-0165
(212) 594-5300  Fax: (212) 868-1229
www.milberg.com

San Diego
San Francisco
Los Angeles
Boca Raton
Seattle
Philadelphia

October 3, 2003

**VIA FEDERAL EXPRESS**

The Honorable Dominic J. Squatrito
United States District Court Judge
United States District Court
Abraham Ribicoff Federal Building
450 Main Street
Hartford, Connecticut 06103

    Re: *JLM Industries et al. v. Stolt-Nielsen SA et al.*, Docket No. 3:03 CV348 (DJS)

Dear Judge Squatrito:

    Yesterday, we received a copy of Defendants' Motion To Hold In Abeyance Plaintiffs' Motion For Class Certification And To Stay Defendants' Response Thereto. Notably, Defendants Stolt-Nielsen SA and Stolt-Nielsen Transportation Group have not joined in this application. Defendants who have made this application have requested expedited review of their motion.

    The statements made in this motion are inaccurate and incomplete, thereby requiring immediate clarification.

    *First*, Defendants contend that JLM's motion "for class certification at this stage in the proceedings is improper." Def. Mem. at 2. There is nothing improper about the filing of a motion at the direction of a court. In fact, on June 24, 2003, this Court instructed the JLM Plaintiffs to file a motion for class certification on or before September 19, 2003 ("Order"). The filing of the class certification motion was, therefore, in simple compliance with this Court's Order.

    *Second*, Defendants suggest there is no factual basis upon which to certify a class and ask this Court to improperly consider the merits of the claim in connection with class certification.[1] They contend that Plaintiffs' motion for class certification is based upon nothing more than a "blithe assertion" and "a single news report." Def. Mem. at 12. Defendants ask this Court to ignore the obvious.

---

[1] *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Caridad v. Metro.-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999), *cert. denied*, 529 U.S. 1107 (2000) ("In deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class.").



Milberg Weiss Bershad Hynes & Lerach LLP

     Over the past seven months, scores of news articles have been published providing more factual detail about the alleged conspiracy and the status of the criminal investigation, including the indictment of Stolt-Neilsen Executive Vice-President Richard B. Wingfield. *See* Exhibit A. There have also been articles that other Stolt-Nielsen employees have admitted participating in the conspiracy. *See* Exhibit B.

     Plaintiffs' assertion in their class certification brief that the existence of and Defendants' participation in the alleged conspiracy is "beyond doubt" is based upon facts from these numerous articles which have been incorporated in the motion.

     These articles make clear that when Stolt-Nielsen's former General Counsel publicly disclosed the existence of the price-fixing conspiracy, Stolt-Nielsen immediately ran to the United States Department of Justice, Antitrust Division seeking conditional amnesty under the Corporate Leniency Program.

     Should there be any "doubt" about the existence of the conspiracy and Defendants' participation therein, a recent press release and news articles, which Defendants fail to mention, confirm the existence of and Defendants' participation in the alleged anticompetitive conspiracy in violation of § 1 of the Sherman Act. 15 U.S.C. § 1.

     On September 29, 2003, the day before this motion was filed, Defendant Odfjell Seachem AS, and Odjfell ASA's Chief Executive Officer and Vice-President **pled guilty** to "participating in an international cartel to allocate world customers, rig bids, and fix prices on parcel tanker affreightment contracts for the shipment of liquid chemicals to and from the United States and elsewhere . . ." as alleged in the JLM Amended Complaint. *See* Exhibit C.

     No matter how hard Defendants try to continue to cloak the conspiracy, the curtain has been lifted and it is indeed "beyond doubt" that Defendants Stolt-Nielsen and Odfjell participated in a broad antitrust conspiracy as alleged in the Amended Complaint.

     *Finally*, the moving Defendants argue that the motion for class certification should be held in abeyance until after the Judicial Panel on Multidistrict Litigation ("JPML") has ruled on the motion(s) to transfer. Defendants concede that all presently pending actions "seek to represent the same class of plaintiffs." Def. Mem. at 10. Therefore, the motion is appropriately made in this, the forum of the first class action filing, as the punitive class and class period will be identical no matter where the JPML transfers these cases.

     There is simply no good reason to delay class certification at this juncture. It was Defendants' choice to delay over six months before making their motion before the JPML. That delay should not now inure to their benefit by delaying the issue of class certification indefinitely.

Milberg Weiss Bershad Hynes & Lerach LLP

Because "courts resolve *doubts* in favor of certifying [a] class", we respectfully submit that Defendants' motion should be denied and briefing on the motion for class certification should proceed expeditiously along with appropriate discovery. *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998) (emphasis added).

Respectfully submitted,

Michael M. Buchman

cc: All Defense Counsel of Record

Exhibit A

2/20/03 Wall St. J. A1
2003 WL-WSJ 3959712

# The Wall Street Journal

Copyright (c) 2003, Dow Jones & Company, Inc.

Thursday, February 20, 2003

Ship Mates: How Seagoing Chemical Haulers May Have Tried to Divide Market

---

Stolt and Odfjell Discussed Both Routes and Rates, Documents Seem to Show

---

Who'll Carry 'Lubes' to Peru?
By James Bandler

GREENWICH, Conn. -- Two of the world's biggest shipping companies appear to have colluded for years to divide up much of the market for transporting liquid chemicals across the sea.

The two companies -- **Stolt-Nielsen** SA and Odfjell ASA -- discussed which shipping business each would bid for, route by route, even at times exchanging information on bid prices, Stolt documents and interviews with former company officials suggest. Stolt officials also crafted tables on how much better their revenue would be if they cooperated than if they competed all-out.

The companies, both of which have roots in Norway, are unknown to most consumers. But the chemicals, fats and oils they carry are the building blocks of modern life -- used to make everything from the plastic shells of computers to nylon, paints, shaving cream and salad dressing. Higher shipping rates on such freight mean slightly higher prices for everyone.

Yesterday, European authorities conducted a surprise inspection of Odfjell operations in Bergen, Norway. The purpose was "to ascertain whether there is evidence of a cartel agreement and related illegal practices," said the EFTA Surveillance Authority, a body set up to ensure fair trade. Odfjell pledged to cooperate with the probe. Asked earlier about its relations with other shipping companies, an Odfjell senior vice president, Jarle Haugsdal, said in a statement: "We in our business dealings always have acted well within the relevant competition laws."

Stolt said yesterday that it is a subject of a European Commission probe of competitive practices and is cooperating.

In the U.S., meanwhile, Stolt faces a lawsuit by a former general counsel of its transportation unit, who has accused Stolt of violating U.S. and international antitrust laws by fixing prices and colluding. Former Counsel Paul O'Brien alleged that Stolt refused either to cease or to investigate conduct he questioned, leaving him no choice but to resign to avoid being part of possible ongoing criminal conduct. His suit, filed in Connecticut Superior Court in Stamford, doesn't mention Odfjell.

Stolt calls its former general counsel's allegations baseless, and an outside lawyer for Stolt has argued that they were made in an effort to extract money. (Mr. O'Brien is seeking back pay and lost future wages.) Stolt's policy is to "operate in full compliance with the laws of the United States and with laws of all countries," says Samuel Cooperman, who is chairman of Stolt's

transportation unit and is the official Mr. O'Brien says refused to begin a probe of his complaint. Mr. Cooperman declined to answer detailed written questions covering the specifics of the allegations.

It is permissible for carriers to cooperate in certain ways. For instance, if two of them both carry chemicals for a given producer on the same route, they may pool their capacity for the purpose of operational efficiency. Carriers also may form formal joint ventures to bid for a piece of business. But cooperating to divide markets or to affect prices would clearly fall outside these permitted arrangements.

Stolt and Odfjell each book close to a quarter of the roughly $2.5 billion spent each year shipping liquid chemicals by sea. They transport them in giant ships called parcel tankers, each fitted with as many as 52 separate tanks. Jo Tankers of Rotterdam -- which was founded by different members of the same Norwegian family that dominates Odfjell -- has another 9% of the market. Tokyo Marine Co. of Japan has about 6%.

Odfjell operates intercontinental tankers plus smaller ships in regional trade. It is publicly traded but family-dominated. Stolt is more diversified, involved in fish farming and offshore construction in addition to its chemical shipping. Stolt is registered in Luxembourg, with a headquarters in London, but senior shipping managers operate in the U.S.

Though Stolt is public, listed in Oslo and on the Nasdaq Stock Market, the company remains 49%-owned by the family of its founder, Jacob **Stolt-Nielsen**. He is chairman and two sons are directors, including Niels, the chief executive. Stolt's family ties, Mr. **Stolt-Nielsen** once declared in the in-house journal, differentiate Stolt from big conglomerates run by managers whose "moral fiber" is thin. "No one cheats when mamma sits at the cash register!" he wrote.

In summer 1998, Stolt managers from around the world gathered near the Connecticut offices of the company's shipping unit. It was a rough time for the parcel-tanker business. The Asian financial crisis had depressed chemical volumes, and with a glut of new ships making matters worse, freight rates were suffering.

But as the executives sat overlooking the golf course on a back patio of the Greenwich Country Club, Andrew Pickering, then vice president for tanker trading, had calming news. According to people familiar with the meeting, he said that Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell. They had "carved up the world," he said, according to one attendee.

No one at the meeting questioned Mr. Pickering, say those familiar with it. But Kenneth Bloom, a Stolt vice president for logistics, had concerns that what he was hearing smacked of collusion. Mr. Bloom says that he took his concerns to Mr. Cooperman, then chief executive of the Stolt transportation unit. Stolt then held a seminar on antitrust law for Mr. Pickering and a few other executives, say people familiar with the matter.

Mr. Bloom, who now runs a company in a different segment of the industry, referred further questions to Stolt. Mr. Cooperman declined to comment on Mr. Bloom's account. Mr. Pickering, now managing director of Stolt's Asia Pacific business, didn't respond to requests for comment.

The Asian crisis passed, but chemical shippers faced new challenges. Huge

mergers of petrochemical producers -- BP with Amoco, Exxon with Mobil -- increased the producers' heft and negotiating power.

On May 24, 2000, Richard B. Wingfield, a New Zealander who was managing director of Stolt's Asia Pacific service, e-mailed colleagues in Greenwich. The subject: talks with the No. 4 parcel-tanker company, Tokyo Marine. The e-mail said he had spoken to Satoshi Kuwano, its chief executive. "Kuwano realises," wrote Mr. Wingfield, using British spelling, "that the only way to move the market is through cooperation."

In another e-mail the same day, Mr. Wingfield cited a talk with another Tokyo Marine executive who, he said, was interested in finding a way for the shippers to work together after the merged BP-Amoco entered an Asian market. Mr. Wingfield wrote: "He wants cooperation on rates. The problem is to get everyone to cooperate."

Tokyo Marine and the executives cited by Mr. Wingfield declined to answer questions about the e-mails. Tokyo Marine said that its "activities have been and continue to be lawful ones." Mr. Wingfield referred questions to Stolt, which didn't comment on the e-mails.

In late 2001, Stolt tried but failed to form a legal joint venture with two European ship owners involving smaller tankers on regional trips. The European Commission raised doubts because of the market share the three would control, says an EC official, who adds that the would-be partners' share of another market -- barge traffic -- drew concerns from chemical makers. The carriers withdrew the joint-venture application.

Later, Stolt officials discussed European shipping with their lawyers from the London-based firm of Linklaters. Linklaters wrote to Stolt in January 2002 that it appeared that a cartel existed in the European inland-barge market, according to information from a person at Stolt. The law firm also said it was concerned that Stolt was violating European antitrust laws, this information shows. Spokesmen for both Stolt and Linklaters declined to comment.

In 2001, Stolt and Odfjell executives grappled with the issue of the Dow Chemical/Union Carbide merger. The new chemicals giant would spend $350 million a year on marine transport. Each of the two big carriers had important pieces of business with each of the chemical companies that were merging.

Stolt handled much of Dow's U.S. chemical exports headed across the Pacific to the Far East. Stolt also carried the bulk of Union Carbide's exports to Europe across the Atlantic.

Odfjell handled Union Carbide's exports to the Far East, and Dow's exports to the east coast of South America.

They knew that after the merger, the big producer's freight business would all be handled under one roof. That posed a threat that either Stolt or Odfjell could be dislodged and price wars could break out. The shipping contracts were due to expire in late 2001. Extensive handwritten journal entries -- dated from September 2000 through December 2001 and examined by The Wall Street Journal -- indicate that officials of the two big ship owners held talks on dividing the pie.

Former Stolt officials say they believe the journals were those of Mr. Wingfield, who by then was managing director of Stolt's parcel-tanker business.

Cover pages bear the notation "RBW," which are his initials. They also bear a distinctive signature that matches his signature on mortgage documents for his house in New York state and on other documents. Mr. Wingfield declined to comment.

A cryptic Feb. 28, 2001, journal entry appears to say that Stolt and Odfjell executives "went through in detail which COA belonged to who." A COA is a "contract of affreightment," which spells out the terms of a shipping transaction.

An entry dated the same day, which comes after citations of chemical shipping in the Caribbean region, refers to a "handshake with OST in Mexico & everywhere in reality." OST was shorthand for Odfjell Seachem Tankers, the informal name of Odfjell's oceangoing transportation unit, according to a former Stolt official.

A third Feb. 28 entry, referring to an Exxon Mobil contract to ship lubricating fluid to Peru, indicates that Odfjell people "want a piece of Mobil lubes pie." This appears under a heading of "EN." The initials EN appear in another part of the journal next to the mobile-phone number of Erik Nilsen, an Odfjell vice president in charge of its transpacific shipping service. Another Feb. 28 journal entry says, "OT gets all of Peru lubes." OT was what Odfjell Tankers was known as before adding a business called Seachem to become Odfjell Seachem Tankers.

Asked about Peru lubes, Mr. Nilsen declined to comment.

Journal entries dated in March 2001 indicate that Stolt and Odfjell scheduled a meeting for March 30 at the South Shore Harbour Resort in League City, Texas. Entries indicate that Odfjell was to be represented by three men: Mr. Nilsen, a vice president named Morten Nystad, and their boss, Mr. Haugsdal. Representing Stolt would be Mr. Wingfield and his lieutenant, Bjorn Jansen, senior vice president for Pacific service.

Journal entries suggest Stolt and Odfjell executives spent much of the afternoon reviewing the status of contracts around the world, trade lane by trade lane. A notation indicates Odfjell wanted to bid for its old Union Carbide contracts to ship chemicals to Asia from the Gulf of Mexico. One entry then says: "both talk to Dow & compare notes."

Odfjell's Messrs. Nilsen and Nystad say they have never discussed confidential customer matters with Stolt executives. Mr. Nystad referred questions to Mr. Haugsdal, who declined to respond to specific questions. Mr. Nilsen said: "We are honest. We live by the law."

Stolt's Messrs. Jansen and Wingfield declined to answer questions.

After the meeting, Stolt executives attempted to quantify the costs and benefits of cooperating instead of competing, according to tables and spreadsheets that were part of a fax to Mr. Wingfield from Mr. Jansen dated April 10, 2001. It suggests that "the coop" -- a term used at Stolt to describe its relationship with Odfjell -- kept freight rates on key accounts 5% to 25% higher than they would otherwise have been.

The spreadsheets included estimates of the impact of the coop on specific contracts. For Stolt contracts involving Dow's Pacific business alone, the coop with Odfjell meant that freight rates might be as much as 25% higher than

otherwise -- equal to $10 million a year -- the Stolt spreadsheets indicated.

In the fax, Stolt's Mr. Jansen compared the economic costs of "going to war" with Odfjell versus continuing the coop. He wrote that in certain trade lanes, such as the Indian Ocean, Stolt might benefit if the coop was disbanded. But he said that overall, the loss of the coop would mean lower freight rates.

What's more, Mr. Jansen continued, disbanding the coop at that time would be a "particularly poor" choice. Odfjell, he wrote, was "not desperate to coop to 'survive.' If we break the coop now, it is likely to take a long time to put it back together. . . . If you add it all up, it is difficult to see the sense of going to 'war.' "

A spokesman for Dow said it hadn't seen any information to suggest its bidding procedures had been violated, but Dow would be "awfully concerned if those kinds of conversations were going on." Later, the spokesman said that the chemical company was following up with a thorough investigation of the matter.

In response to written questions about the fax and other documents, Stolt said in a written statement that it couldn't comment on material that was "stolen or otherwise improperly removed without authorization." Stolt also said, without elaborating, that some questions involved material that was privileged under the attorney/client relationship.

By April 2001, the contacts between Stolt and Odfjell were becoming more intense. Stolt made it clear, the journal entries indicate, that unless Odfjell promised to help it keep its contracts with Dow to ship chemicals to the Far East, Stolt wouldn't help Odfjell obtain a contract it was seeking with Sasol Ltd. in South Africa to ship chemicals from there to India and the Far East.

A journal entry also appears to say an Odfjell executive told a Stolt executive that if the two sides didn't "reach agreement on Sasol then nothing to talk about -- not debatable. Full war."

The journals are replete with notations such as "no written agreements" or "no paper." A May 2001 entry refers to knowledge Stolt had obtained about plans that Jo Tankers had about a Dow contract, followed by the words: "Don't be seen as doing something together." Jo Tankers didn't respond to questions.

By the summer of 2001, Stolt and Odfjell were weighing alternative approaches for how to handle the Dow matter. They had gone to Dow with an idea of doing a joint bid for its export business from Gulf of Mexico ports. Dow confirms the approach and says it said no.

A report to Stolt executives from Tokyo Marine's Mr. Kuwano heightened concerns that Dow might replace Stolt on some trade lanes. Entries in the journal indicate that Mr. Kuwano, after meeting with Dow officials, related that they were "angry" and had a "strong feeling" that Stolt and Odfjell were "power playing" Dow in the Gulf. Dow won't comment on what Mr. Kuwano might have said to Stolt, but confirms that it expressed unhappiness with efforts by Stolt and Odfjell to do a legal joint bid.

Among matters Stolt and Odfjell appear to have discussed were Dow and Union Carbide shipments to Australia and New Zealand from the U.S., which Odfjell was handling. Stolt planned to bid for the business from the merged company -- at 10% above Odfjell's old rate -- one journal entry indicates.

A former Stolt official says that Odfjell had agreed to cede this business in exchange for cargo volume elsewhere.

On chemical shipments to the Far East, Stolt planned to bid 4% higher than its pre-merger rates, according to journal notes. A notation on the same page suggests an Odfjell executive was "totally on board."

On Jan. 24, 2002, Mr. Wingfield announced to the Stolt transportation group's management board that the Dow contracts were all but locked up, according to one person present, under these terms: Stolt would get 70% of Dow's westbound business from the U.S., with Odfjell claiming much of the rest; and Stolt would also get new business from the U.S. to Australia and New Zealand. According to the person present at this meeting, Mr. Wingfield added, "We had a lot of help from our friends from the mountains." Odfjell's Bergen locale is nestled in the mountains on Norway's southwest coast.

Eleven days after that, Mr. O'Brien, then general counsel of Stolt's transportation unit, asked Mr. Cooperman, the unit's chairman, to suspend Mr. Wingfield, according to an internal Stolt document. It shows the request was turned down. Mr. O'Brien's lawsuit says Mr. Cooperman also rebuffed his request that Stolt do an internal investigation. On March 1, 2002, Mr. O'Brien tendered his resignation.

On March 12, Stolt was scheduled to hold a regular meeting of its business directors. Item No. 4 on the agenda was an "antitrust update." The presenter, according to the agenda, was Mr. Wingfield.

Word Count: 2796
2/20/03 WSJ A1
END OF DOCUMENT

Copyright 2003 Lloyd's List International
Lloyd's List

February 21, 2003

SECTION: News; Pg. 3

LENGTH: 480 words

HEADLINE: Chemical TankersnOdfjell-Stolt trauma a new blow to credibilityLeaked documents could be disastrous public relations for the shipping industry, writes Rajesh JoshiWHEN Lloyd's List met Odfjell chief executive Bjorn Sjaastad at his Bergen office in August, 2001, his company had teamed up with its main rivals, Stolt-Nielsen and Tokyo Marine, and one other partner to bid for a chemical transport contract in Asia with Dow Chemical, which had acquired Union Carbide earlier in the year.

BODY:

Was it not unusual for Odfjell to team up with its competitors in search of business, Mr Sjaastad was asked.

He answered that it was a complicated project involving a "number of port calls" and rather a special case.

"The decision to team up has been dictated by the huge volumes anticipated to be handled," Mr Sjaastad said. "(It) would be impossible for any one shipowner to manage (all that work)."

For all his terseness, however, Mr Sjaastad had shown absolutely no qualms in being on the record.

But a report in yesterday's Wall Street Journal sought to prove an altogether seamier side to this co-operation between two Norwegian-dominated chemical shipping groups, which between themselves own about 50% of the Dollars 2.5bn global market.

Citing internal documents from Stolt-Nielsen that were apparently leaked by disgruntled present and former employees, the Journal paints a rather damning picture that seeks to prove that Odfjell and Stolt "sometimes met to discuss which ship-ping business each would bid for, route by route, even at times exchanging information on bid prices".

Stolt dominated Dow's US chemical exports to the Far East and Union Carbide's exports to Europe, the Journal states Odfjell was strong in Union Carbide's exports to the Far East and Dow's exports to South America.

The merger between the two would bring Dollars 350m worth of annual shipping business under one roof and allow Dow to cut out either or both partners or trigger price wars. To prevent this, the Journal alleges, officials from the two companies decided to "divide the pie".

For Stolt's contracts involving Dow's Pacific business, the alleged co-operation is said to have kept freight rates "25% higher than otherwise", or Dollars 10m a year.

Unfazed Odfjell and Stolt officials were furiously denying yesterday that any collusion had taken place. Indeed, US anti-trust law appears to allow carriers to co-operate, or pool their ships, in cases where this is necessary to maintain operational efficiency.

They may also do so openly by seeking authorities' blessing for official jointventures.

Moreover, the European leg of the anti-trust investigation is dogged by questions over whether Brussels even has a legal case.

But take a deep breath and it becomes obvious that the Odfjell-Stolt story on the front page of the Wall Street Journal is disastrous public relations for the shipping industry.

It is an old adage that shipping only hits the headlines when there is bad news. But usually this comes in the shape of collisions and oil spills, where at least the fig leaf of "Providence" can be made use of to dress up the facts.

Allegations of collusion, on the other hand, run the danger of painting the industry as a law unto itself.

Could a sad new chap-ter be about to unfold in shipping's quest for respectability?

LOAD-DATE: February 21, 2003

6/25/03 Wall St. J. A3
2003 WL-WSJ 3972102

**The Wall Street Journal**
Copyright (c) 2003, Dow Jones & Company, Inc.

Wednesday, June 25, 2003

Leading the News: **Stolt-Nielsen** Official Is Charged In Global Price-Fixing Inquiry
By James Bandler

Federal prosecutors charged a top executive at **Stolt-Nielsen** Transportation Group with being part of a global price-fixing and bid-rigging conspiracy to suppress competition in the chemical-shipping industry. Executive Vice President Richard Wingfield, managing director of parcel trading at Stolt, was arraigned in federal district court in Philadelphia and charged with a violation of the Sherman Antitrust Act. He is the first to be charged in the wide-ranging federal grand-jury probe.

The charge against one of its most senior executives is a blow for Stolt, a unit of **Stolt-Nielsen** SA, a Luxembourg-registered conglomerate that with Norway's Odfjell ASA leads the industry for marine transportation of liquid chemicals and that also has big fish-farming and deep-sea construction units. Stolt announced in February that it and its executives had received conditional amnesty from prosecution in exchange for cooperation with the government antitrust probe. A condition of the amnesty program is full cooperation with the investigation.

James G. Wieghart, an outside spokesman for Stolt, said the "status of the company amnesty is unclear." He said Mr. Wingfield had been "suspended pending resolution of the issue." Bail was set and secured at $500,000, according to a copy of the arrest warrant. A spokeswoman for the Justice Department, which negotiated the amnesty, declined to comment.

Reached on his cellphone, Mr. Wingfield declined to answer questions about the charges. "I've had somewhat of a rough day today," he said. "I have to clear my thoughts."

Mr. Wingfield's role in the alleged price-fixing conspiracy was the focus of a Feb. 20 page-one article in The Wall Street Journal, which detailed apparent efforts by Stolt and several of its competitors to carve up the global $2.5 billion parcel-tanker industry. The article relied on internal company records, including what former Stolt officials said were copies of Mr. Wingfield's business diaries. The records suggested that Mr. Wingfield and other Stolt executives met and talked frequently with competitors to plan how to bid for contracts with chemical-industry customers such as Dow Chemical Co. Mr. Wingfield's diaries are now evidence in the government's case, according to the affidavit of an FBI special agent.

The federal complaint's statement of fact alleges that beginning at least in March 2001 and continuing until October 2002, Mr. Wingfield and other conspirators "engaged in a conspiracy to suppress and eliminate competition" by allocating customers, fixing prices and rigging bids. The FBI affidavit alleges they agreed not to compete for each others' customers -- either by not submitting prices or bids, or by submitting intentionally high prices or bids.

The affidavit also alleges that a subordinate of Mr. Wingfield, listed only as "Witness A," swore under oath that he and Mr. Wingfield had talks with representatives of a competitor company and agreed not to compete for each others' customers.

The affidavit also alleges a high-ranking executive for an unnamed competitor acknowledged that he and others from his company had discussions with Stolt in which they traded price information about customer contracts. One such discussion allegedly took place in or around October 2002 when Mr. Wingfield asked for, and received information about a contact being awarded by the competitor's customer, according to the affidavit.

Word Count: 564
6/25/03 WSJ A3
**END OF DOCUMENT**

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Exhibit B

SECTION: COMPANY NEWS

LENGTH: 154 words

HEADLINE: Stolt-Nielsen staff admit price-fixing - FBI

DATELINE: OSLO

BODY:

    Some employees of Stolt-Nielsen SA have admitted price-fixing and bid-rigging to suppress competition in the global chemical shipping industry, daily Dagens Naeringsliv reported, citing the Federal Bureau of Investigation.
    Following Stolt-Nielsen's announcement in February that it and its executives received conditional amnesty from prosecution in exchange for co-operation with a US government antitrust probe, several employees have now verified the allegations during questioning, the FBI told Dagens Naeringsliv.
    "We expect additional arrests in this case," FBI agent John Sharp told the newspaper.
    Stolt-Nielsen has been under investigation for illegal price-fixing and bid-rigging with Oddfjell ASA and other shipping companies since February.
    elisabeth.dalseg@afxnews.com
    ebd/rk/jms
For more information and to contact AFX: www.afxnews.com and www.afxpress.com

LOAD-DATE: August 12, 2003

Exhibit C

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect. To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.



# Department of Justice

FOR IMMEDIATE RELEASE
MONDAY, SEPTEMBER 29, 2003
WWW.USDOJ.GOV

A'
(202) 514-200
TDD (202) 514-188

## NORWEGIAN SHIPPING CO. AND TWO EXECUTIVES AGREE TO PLEAD GUILTY IN INTERNATIONAL PARCEL TANKER SHIPPING INVESTIGATION

*Company Agrees to Pay $42.5 Million Fine, Executives Agree to Serve Jail Time*

WASHINGTON, D.C.– Norwegian-based Odfjell Seachem AS, one of the largest parcel tanker shippers in the world, and two of its executives were charged today with participating in an international cartel to allocate customers, rig bids and fix prices on parcel tanker affreightment contracts for the shipment of specialty liquids to and from the United States and elsewhere, the Department of Justice announced.

The company, Odfjell Seachem AS and its executives, Bjorn Sjaastad, Chief Executive Officer of its parent, Odfjell ASA, and Erik Nilsen, Vice President, were charged separately today in U.S. District Court in Philadelphia. The company and both executives, who are citizens of Norway, have agreed to plead guilty and cooperate with the ongoing investigation. Additionally, Odfjell Seachem, with its principal place of business in Bergen, Norway, has agreed to pay a $42.5 million fine for its role in the cartel. Sjaastad has agreed to pay a $250,000 fine and to serve four months in prison and Nilsen has agreed to pay a fine of $25,000 and to serve three months in prison for their roles in the cartel. The charges, fines and jail time are subject to court approval.

"The charges filed today demonstrate the Justice Department's resolve to detect and prosecute companies and individuals involved in international cartels that harm American businesses and consumers," said R. Hewitt Pate, Assistant Attorney General in charge of the Department's Antitrust Division.

Parcel tanker shipping is the ocean transportation of bulk chemicals, edible oils, acids and other specialty liquids. Parcel tankers are deep sea vessels equipped with compartments designed to carry shipments of various sizes. The temperature and other specifications of the compartments can be regulated according to the specific requirements of the type of liquid being transported. A contract of affreightment is a contract between a customer and a parcel tanker shipping company for the transportation of bulk liquids from one port to another. A contract of affreightment typically covers multiple shipments during a certain time period and specifies the price, cargo destinations and other terms and conditions.

According to the charges, between August 1998 and November 2002, Odfjell Seachem, Sjaastad and Nilsen participated in a conspiracy with their co-conspirators which was carried out by:

- attending meetings and engaging in discussions in the U.S. and elsewhere concerning customers fo and prices of contracts of affreightment for parcel tanker shipping of products to and from the U.S. and elsewhere;

- agreeing during those meetings and discussions to allocate customers and to create and exchange customer lists in order to implement and monitor this agreement;

- agreeing during those meetings and discussions not to compete for one another's customers either by not submitting prices or bids to certain customers, or by submitting intentionally high prices or bids to certain customers; and

- discussing and exchanging prices to certain customers so as to not undercut one another's prices.

As a result, the Department said that consumers in the market for international parcel tanker shipping services paid non-competitive and higher prices for parcel tanker shipping.

"The charges and the agreed-upon sentences should send a strong deterrent message to those who participate in international cartels that target American businesses and consumers," said James M. Griffir Deputy Assistant Attorney General in charge of the Antitrust Division's Criminal Enforcement Program.

These cases are a continuation of the Department's ongoing criminal investigation into anticompetitive practices in the parcel tanker shipping industry.

On June 24, 2003, Richard B. Wingfield, former Managing Director, Tanker Trading, for Stolt-Nielsen Transportation Group Ltd., was charged in a one-count criminal complaint with participating in the parce tanker shipping conspiracy.

Odfjell Seachem, Sjaastad and Nilsen are charged with violating Section One of the Sherman Act, which carries a statutory maximum penalty of a $10 million fine for a corporation and a maximum penalty of three years imprisonment and a $350,000 fine for an individual. The maximum fine may be increased to twice the gain derived from the crime or twice the loss suffered by the victim of the crime, if either of those amounts is greater than the statutory maximum fine.

Today's charges are the result of an ongoing investigation being conducted by the Antitrust Division's Philadelphia Field Office and the Federal Bureau of Investigation in Philadelphia. Anyone with further information about anticompetitive conduct in the parcel tanker shipping industry should contact the Philadelphia Field Office at (215) 597-7405.

###

03-537

**YAHOO! FINANCE**  Search - Finance Home - Yahoo! - Help

*publishers of*
**THE WALL STREET JOURNAL**

**Welcome** [Sign In]                                        To track stocks & more, Regis
**Financial News**

Enter symbol(s) [        ] Basic [Get]  Symbol Lookup

 

**Related Quote**



SNSA 3-Oct @ 1:32pm (C)Yahc

SNSA    7.99    -0.01    Nev
**View Detailed Quote**
Delayed 20 mins
Quote data provided by Reuters

### Dow Jones Business News
# Odfjell Tanker Unit Pleads Guilty to Price-Fixing
Monday September 29, 12:07 pm ET
By James Bandler, Staff Reporter of The Wall Street Journal

BOSTON -- The tanker unit of Odfjell ASA pleaded guilty to a federal criminal price-fixing charge and agreed to pay $42.5 million in fines.

The plea agreement, which includes light prison sentences and relatively small fines for two senior executives including the company's chief executive, is a sign that the Department of Justice is turning up the heat on its probe into alleged collusion in the marine chemical transportation industry. The fines and sentences imposed on Odfjell and its executives were reduced because of company's cooperation with the government probe.

As reported earlier this month in The Wall Street Journal, antitrust regulators are considering revoking the conditional amnesty which had been granted to the transportation unit of Odfjell's main rival, Stolt-Nielsen SA .

Under terms of Monday's deal, Odfjell Chief Executive and President Bjorn Sjaastad will serve a four-month sentence and pay a $250,000 fine and vice president Erik Nilsen will serve three months in prison and pay $25,000 fine.

"These are very hard terms, both for the company and the individuals, but we have accepted our responsibility, and the (Department of Justice) has appreciated our assistance and cooperation," said Odfjell Chairman B.D. Odfjell, Jr. in a prepared statement. "We recognize we made a mistake."

Mr. Sjaastad has been granted a salaried leave of absence for six to nine months. Terje Storeng, a member of the board of Odfjell, has been appointed interim CEO and president effective Tuesday. He has been a board member since 1994. A European antitrust investigation is ongoing.

-By James Bandler, The Wall Street Journal; 617-654-6864

Email this story - Set a News Alert

[        ] Search News

**Related News Stories**

- Former Counsel at Stolt Calle to Testify Before Grand Jury - Dow Jones Business News (Mon Sep 2
- Stolt-Nielsen Discloses Issues With Its Lender Agreements - Dow Jones Business News (Thu Sep 1(
- Stolt Offshore expects higher losses for year - Associated Press (Wed Sep 17)
- Stolt-Nielsen S.A. Financial Update - PrimeZone Media Network (Wed Sep 17)

More

- By industry: Maritime/shipbuilding, Oil/energy, Transportation

**Top Stories**

- Payrolls Have First Gain in 8 Months - Reuters (2:04 pm)
- Stocks Surge as Employers Add Jobs - Reuters (12:58 pm)
- Treasuries Bashed by Jobs Report, Stocks - Reuters (1:51 pm
- Final Vivendi, NBC Definite Deal Delayed - Reuters (12:49 pm)

More

- More Dow Jones Business News
- Most-emailed articles
- Most-viewed articles